Good morning, Your Honor. May it please the Court. I'm accompanied today by my partner, Joseph Daley, and my co-counsel, Marisa Livesey of Barak Rodos. I'd like to reserve five minutes for rebuttal, if that's all right. You bet. Get the clock rolling. Here we go. Thank you, Your Honor. This actually is a relatively simple case with, I think, a fairly simple central question presented. That deals with a $1.7 billion transaction in which shareholders are asked to approve acquiring a division of a company, and stock is issued to the public market to be traded publicly pursuant to a registration statement filed with the SEC. And nobody bothers to mention that the company's profitability or the division's profitability in this $1.7 billion transaction has collapsed by 50%. Now, the question is whether that might be misleading to somebody, and the district court held no, it's not. I think that that's error in light of the disclosure obligations under the Federal Security Statute, and indeed, even under the disclosure obligations that preceded them in common law principles. If you're engaged in a major transaction involving an ongoing business and there's been a substantial change in what's going on at that business, you have to tell people who are involved in that. You have to tell the shareholders before they vote. And here, when were shareholders told? Not before that proxy vote. You've got a proxy, joint proxy and registration statement filed one week before the close of the first quarter, in which earnings have collapsed 50% from the year before for Divicom. You've got a shareholder vote on April 24th, more than three weeks after the close of that first quarter, and there's no question that the defendants know it's been a horrible quarter. Indeed, they issue a press release, C-Cube does, the company that owns Divicom, issues a press release that announces that the shareholders have voted to approve, announces C-Cube's financial results at the very front of the press release, saying that we're no longer including Divicom's financial results in our round, and then on the third page, buried in the tables, is a figure indicating that Divicom had $1.5 or $1.6 million in earnings. That basically gets overlooked by the market because it's not until May 15th, when 10-Qs get filed, the securities analysts pick up on what's going on, and it's not until May 15th that there's the disclosure that the earnings have collapsed 50%, not on one-time adjustments, not on accounting technicalities, but based on the fact that the sales that people thought were there are gone. This is a company that has presented to shareholders, has presented to investors, Divicom was growing 25%, 35%, 40% on an annual basis in its revenues and earnings, and here's a dramatic collapse. Is that misleading, not to tell people about that? You bet it is. Now, there was a risk factors section in the prospectus proxy registration statement, which tried to give some information, or was supposed to give some information, so that shareholders could evaluate the historical performance and historical financial results in deciding to vote and other shareholders in taking shares or purchasing the newly registered shares in the open market. The risk factors are supposed to include material information showing that there's a difference in the image that's painted of this company, in the data that's been given, and the reality. Here there clearly was one. Here there is no question that the first quarter was a disaster, no question that expected sales had evaporated, and no question that they didn't disclose that. What did they say in the risk factors? They said, well, you know, Harmonix customers and sales are concentrated on a few customers like AT&T. Divacom, the company being acquired, they have concentrated sales and a few customers canceling those sales could cause it to take a big hit. But do they reveal that they're taking a big hit? Do they reveal that there's a problem? No. You have to plead scienter with a heightened degree of specificity, right? For the Section 10b claims, yes, Your Honor. And the district judge held you didn't do that. Yes, Your Honor. What's the story on that? Well, I think with respect to CQ, the scienter is clear. You've got a proxy that says that this is going to be current as of the shareholder votes, and you've got a May 3rd stock offering because it's May 3rd that the merger and offering go through. There's no question that CQ had the material data. There's no question they knew this was material, and there's no question that they chose not to disclose it prior to the votes. Now, with respect to Harmonic, is there a reason to think that Harmonic also knew what was going on in the Divacom division? And I think, yes, the facts that are alleged raise a strong inference of that. We have information from confidential witnesses indicating that there was a merger board that was formed in October of 1999 that included top officers from Harmonic and top officers from Divacom to integrate the two businesses. Now, you think that in terms of these folks meeting every two weeks and a due diligence going on investigating the business that's being acquired, that they're not paying any attention to the current quarter, aren't paying any attention to how customers are reacting to this stuff? Of course they were paying attention to that. And we've got allegations regarding Dennis Beaver, a director of purchasing, and a member of that merger board, who according to a confidential witness in the purchasing department within Harmonic, communicated that within Harmonic. Let it be known that there were serious problems with Divacom sales. So I think it's absolutely clear there are facts pleaded here that raise a strong inference of knowledge, and fraudulent intent with respect to both CQ and Divacom and the top officers and directors at the two companies. Now, something else that you want to take a look at is the fact that you've got substantial insider selling by some of the defendants here, in particular by the folks over at CQ. Now, by itself, that stuff might not raise a strong inference of cyander, but when you combine it with the fact that these people had due diligence obligations. Mr. Isaacson, under the terms of the merger, were not the CQ individuals required to exercise their options? Well, under the terms of the merger, they were required to exercise their options. Was it not necessary for them to pay for those options with money? They would have to pay for the options in one way. So not one way of getting money, selling their shares. Well, they could open a margin account. They could do a number of things, Your Honor. They did not choose to hold on to those shares. And even somebody like Tom Lukabaugh, who's the president of the Divacom division, he unloads 77% of his shares invested options. If you do a Black-Scholes adjustment of the economic reality of the value of the options and such, it comes to a 43%. Now, that's somebody who's staying with the division as it goes. I think you've got a fairly strong inference there. And, again, I'm not saying that the insider selling in this case in and of itself would raise a strong inference of Slander. But just as in this Court's recent precedents, such as Dow Systems, it's a factor that needs to be considered. You've got a motive here. The motive is Dow involved some out-and-out accounting fraud. Dow involved out-and-out accounting fraud. And you know there was an outside director whose sales were held to be nonprobative, and he was let out of the case on the 10B claims because it was an accounting fraud that only the people inside the company would have known about and that that director had no reason to know about, even if he was exercising due diligence. Here we've got a problem with the sales and the ongoing quarter. The directors all have a due diligence obligation under the securities laws of the United States to assure that the registration statement is true and complete. That includes outside directors. And this is not data that was being hidden from outside directors by means of an accounting fraud. This is data that with a little bit of due diligence they would have found. The Sixth Circuit in Bridgestone-Firestone just this month held that you've got to consider due diligence obligations and what people are going to find in due diligence, that an acquiring company likely in exercising due diligence and doing an investigation is going to find out about major problems within the acquired company. All the stronger. I mean, that applies to Harmonic and its officers and directors here. It's all the stronger with respect to the insiders and directors at CQ who were responsible for the statements that were made in the joint proxy and registration statement. Those were their statements. They signed the document. They're liable as a matter of law, and they're obligated to make sure that stuff is true. It was negligence as a matter of law that they didn't do that, and I think that the fact that they had the obligation to do that suggests that the information was available and it amended to recklessness as well, that they didn't look, assuming they didn't. Now, the case is one unquestionably that could have been treated a little bit more neatly. We have a lot of stuff in that complaint about ANTT. I apologize if the district judge got confused by the various theories that were being advanced here, but I think it was absolutely clear that at the core of our case were allegations that the defendants were obligated to tell the truth about DIVACOMS, the full truth about DIVACOMS' current state when they're asking people to vote for an acquisition and they're issuing shares to the public. Now, I understand. Go ahead and finish your thought, and then I want to ask you about the Section 11 and 12 claims. Okay. I understand that with respect to the Section 11 claims, in the merger transaction, the stock, the registered shares, is being issued to CQ shareholders who are exchanging shares. But it's not a private offering. These are publicly registered shares to be publicly traded, and as soon as those CQ shareholders get them, they're selling them in the public market. So you can't measure the disclosure obligations in this case and whether the prospectus was misleading under Section 11 in terms of, well, did the people who were giving up CQ shares for Harmonic shares get a good deal? Would they have gotten a better deal or a worse deal if the full truth had been told? The fact is that this is information for public investors, and shareholders bought those registered shares immediately as soon as they were being traded. This Court in Hertzberg v. Dignity Partners rejected a district court holding, reversed a district court holding, that said only people who got shares in the transaction can have a Section 11 claim. This Court in Hertzberg v. Dignity Partners said no. If a share has been registered, anybody who buys that share within, you know, the three-year period in the statute of repos, now it's perhaps five years, but the three-year period in the statute of repos may have a claim. If they buy more than a year after the offering, when financial statements for that year have been issued, they have to show reliance. You don't have to buy in the offering. Well, here we've got a registration statement that is misleading under Question 11, and the question presented for this Court is are there misleading misrepresentations or omissions? Well, she had a problem with your pleading of the 11 and 12 claims, right? She said that these claims, although not governed by the PSLRA, still had a heightened requirement because they sounded in fraud. Yes. Okay. Where do we go with that? Well, for one thing you could do is endow systems and basically say because the Section 10b claims are pleaded with particularity, obviously the Section 11, 12, and 14 claims are, too. And I think that that's, you know, a sensible approach in the facts here. Another point that you might observe is that ---- I think what the judge was asking you is do you agree with the district court judge that if your claim under Section 11 of the 1933 Act, quote, sounds in fraud, unquote, under Dow Systems, you have to plead it in accordance with Federal Rule 9? Well, I do not believe that that is the law that the Supreme Court would ultimately uphold. That arguably is the law under Dow Systems. Isn't that the law of our circuit? That appears to be the law of the circuit. But that leaves the question, what does it mean to sound in fraud? If it sounds in fraud, you have to plead with particularity. Do these claims sound in fraud? As Your Honors were pointing out, Dow Systems involved a deliberate intentional accounting fraud, sending people in on the weekends to plug in computers to generate phony revenues to recognize ---- And here you're claiming that there was deliberate fraud in not publishing the first quarter results of DIPICOM. Here I am saying that it was misleading and a material omission of information required by law not to report that. And it didn't happen by accident. I don't think it happened by accident. If it didn't happen by accident, I've got all of my claims, and it doesn't matter whether the particularity requirements apply because I've met them. If you agree with the defendants that I haven't pleaded any facts that show cyander, then you strip the cyander allegations out, and I've got allegations that material information was omitted, their position saying, well, maybe it should have been in there, but we didn't know or we left it out in good faith. I've still got a Section 11 claim, and if you take that away from me, I think you're violating Supreme Court precedent. Because in Herman and McClain v. Huddleston, the Supreme Court said the Securities Act's remedies in the 33 Act and the 34 Act are cumulative. They don't preclude one another. You add them up together. And it cannot be that if I plead facts that give me a Section 11 claim, that also give me a 10b claim if there's cyander, I've somehow lost my Section 11 claim. Let me ask you one other question. Is your position that you have alleged in your Second Amendment complaint all the facts regarding Section 11, Section 14 and Section 12 that you intend to allege, or are there certain other facts which, if allowed to amend, you would allege? If I were allowed to amend, Your Honor, I think we would be adding additional detail to the confidential witnesses. That, I think, is primarily going to particularity for 10b. Is that put out in writing in any of your papers on appeal? Pardon me, Your Honor? The fact is that are those additional facts shown to us in any writings on appeal? Absolutely, Your Honor. Where? At the end of the opening brief in the section on leave to amend. I think I've stated a claim without leave to amend. I think I've stated Section 11, 12 and 14 claims without leave to amend to add anything. If, you know, we had leave to amend to add information, yeah, I think we would be adding material. We'd be focusing the case more clearly on the Section 11 and 12 and 14 claims and precisely why they were misleading. And what would be the nut of what you would be alleging as to Section 11, 12 and 14? The nut of it would be that in a prospectus for a stock offering, you are supposed to put all of the material facts that are necessary to evaluate the company's condition. That's an allegation of duty. What are the facts that you would allege that were known or should have been known or in the exercise of reasonable care were known and should have been revealed? Well, we've got the facts. We've got the fact that earnings had collapsed. We've got the fact that- So you're talking about Divicom's earnings in first quarter collapse. Earnings and sales in first quarter collapse, you bet, that it was known to the defendants, that that was a material development, a 50 percent drop. Shaw v. Digital Equipment, the First Circuit said that a far smaller drop than that before the end of the quarter is something that the defendants probably knew about and has to be included under Section 11. This court and software tool works. Anything else that you would allege, if allowed? With respect to Section 11 and 12, I would have more clear allegations concerning the April 24th press release with the disclosure that Divicom- April 24th press release relates to the fact that shareholders have voted to approve the merger and indicates that they've got their financial results. The allegations currently are unclear with respect to the figure on Divicom earnings. Are you telling Judge Bea that you would try to replete the claims that sound in fraud with more particularity, or are you saying that you would replete them so they don't sound in fraud? Oh, I'd be happy to replete them so they don't sound in fraud. Which is- And I have not pleaded 10B claims. If you feel that there are no 10B claims stated here because there's not sufficient particularity, then obviously we could file an amended complaint that removes any allegation of slander of any kind arising to deliberate recklessness of Silicon Graphics. We can state those claims, and I think that the Supreme Court's opinions on leave to amend, Foman v. Davis, which was decided in the context of a 59E motion following entry of judgment, indicate we should get that leave. I would like to reserve my leaving time. You have two minutes. Thank you. You betcha. We will now hear from the appellees. Do you folks have you divided up your time as you see fit? Great. Good morning. Good morning, Your Honors. May it please the Court. I'm Terry Garland, representing the Harmonic Defendants. With me today is Margaret Wolfe, my office, and Cheryl Fong, representing the C-Cube Defendants. We will be dividing our time equally. In our brief, we discussed several independent reasons for affirming the district court's decisions. Today I plan to focus on only one of them, the issue of duty. By this appeal, plaintiffs ask the court to expand that duty far beyond the language of the federal securities laws and far beyond this court's precedents. They rely on broad principles and lofty precepts about the purpose of the securities law, but they often ignore both the specific statutory language and the court's cases interpreting it. In this case, the question of duty arises at two points in time. First, on March 24, 2000, when Harmonic mailed the registration statement to shareholders, was there a duty to disclose that Divicom was experiencing declining sales in the quarter that was in progress at the time? And second, did a duty to report Divicom's first quarter results arise after the mailing and before the vote? The first date, March 24, is significant not only because it was when the registration statement was mailed, but also because the registration statement had become effective by that date. According to the plain language of Section 11, the effective date is crucial. The statute explicitly states that it applies when some part of a registration statement is misleading when such part became effective. Those are the words of the statute. Plaintiffs never address that language. They fail to even allege the effective date of the registration statement. But it's in the record. According to the registration statement, the document had been declared effective by the SEC before it was mailed on March 24. When was it declared effective? It was on March 23, the day before. So you say it's pretty difficult to state the earnings for the first quarter, which goes from January 1 to March 31 on March 23. Yes, I agree with that. It is. And it's a court would like to cite to that. It's our supplemental excerpts at item 63, page 57 for the effective date. This is one of the many facts that distinguishes software tool works. In that case, the court noted that if a company experienced a bad quarter between the time it filed a preliminary prospectus and the time when that became effective, then the company would be required to disclose the bad quarter. That is not this case. In software tool works, there was a gap in time between the filing of a preliminary prospectus and its effective date. Here, there is no such gap. Plaintiffs are challenging a final effective registration statement. Also in software tool works, the SEC had specifically asked the defendants for information about the quarter that was in progress at that time. And the defendants lied. They gave falsified information to the SEC. That's another fact that distinguishes software tool works. Now, plaintiffs argue that the registration statement was misleading as of March 24, even though the quarter hadn't ended because it failed to disclose that Divicom was experiencing a declining sales. Now, there's no regulation that explicitly requires disclosure about a quarter in progress. So plaintiffs rely on item 303A. They say that regulation creates a duty here. But as this court explained in Stekman, item 303A contains two threshold requirements. First, plaintiffs must allege a known trend. And second, plaintiffs must allege that management would reasonably expect that trend to have a material impact on the continuing operations of the registrant. In this case, the registrant is Harmonic. Plaintiffs have not met either test. Now, they take us to task for talking about Harmonic's expectations about the merger. But we didn't get that from thin air. That's what the regulation states. It requires an assessment of management's reasonable expectations about continuing operations. Now, in this case, plaintiffs allege that Divicom's sales had slowed during the first quarter because its customers were concerned that Harmonic would not be committed to the satellite business. Those allegations don't provide any basis for concluding that Harmonic's management would expect the slowdown to persist following the closure of the merger when Harmonic would have the opportunity to demonstrate that it, in fact, was committed to being in that business. In fact, Harmonic's desire to be in the satellite business was one of the main reasons it gave for wanting to acquire Divicom. So plaintiffs haven't alleged anything that would make it reasonable for Harmonic to expect that the slowdown would persist after the merger. And that's what Item 303 requires. Now, plaintiffs also mention a duty to disclose arising from trading and securities, a factor the First Circuit relied heavily on in the Shaw case. But as this Court recognized in the McCormick case, which plaintiffs signed, that duty applies to a corporation only where the corporation is trading with its own shareholders. That's in footnote four of the McCormick opinion. And the Court also noted that the duty does not apply when a corporation is trading with someone else's shareholders. And that's what was happening here. Harmonic was using its stock to buy Divicom from the C-Cube shareholders. Why shouldn't they be given another chance to file an amended complaint to bring 11 and 12 claims that don't sound in fraud? Well, we've seen what they have to offer. We've seen a proposed amended complaint. We've heard what Mr. Isakson has said here today. And none of those save them from any of these flaws. The duty to disclose is not tied to particularity. No, they just have to show a negligent omission, right? That makes the registration statement misleading as of the effective date. Okay. And why shouldn't they be allowed to replete that without the particularity requirement of Rule 9? We're not relying exclusively on a particularity requirement of Rule 9. Based on what they have alleged, the reasons for the slowdown, that does not show that it was likely to have an effect on continuing operations. Also, if they rely on Item 303 for their duty. What you're saying is, I believe, pardon me if I've got it wrong, that whether it's in negligence or whether it's in fraud, the statements made were not misleading. That's absolutely correct, yes. And there was no duty to, therefore, no duty to disclose this information because it wasn't required to make the statements not misleading. So repleting to avoid 9b would take care of only one of their problems. It wouldn't resolve this fatal flaw. That's not the problem the district judge found, though, is that right? Well, actually, in the third opinion, the one on the Rule 59e motion, she did address this issue, but she had dismissed also on the basis of 9b. As we proceeded in the case, the case gets narrower and narrower and it becomes easier to see the issues. I think at this point we can see the duty issue clearly and realize it's not a matter of particularity, it's whether the statement was misleading and the information was required to be disclosed. Going on to Mr. Isaacson has said a few times that shareholders would have liked to have known that there was a duty to disclose fully and fairly all information. Well, let's take a look at what Harmonic did say about this merger. It gave a list of its reasons for wanting to acquire Divicon. And expectations about first quarter earnings were nowhere on that list. The list is in the Harmonic supplemental excerpt, item 63, pages 29 through 30. So Harmonic said it thought the merger was a good idea because it would allow Harmonic to offer a more complete line of products to existing cable customers, and because it would allow Harmonic to expand into satellite, telephone, and wireless, and because it would allow Harmonic to use Divicon's technology and resources to develop new products. So Harmonic was in for the long run. It wasn't a one or two quarter deal. They were acquiring a company that they wanted to do business with and make part of their own business. Plaintiffs haven't alleged any facts showing that the board's decision was wrong. And this is where we get to the board's recommendation that the merger is in the interest of the Harmonic shareholders. What they allege actually in their complaint is that following the merger in late June 2000, Harmonic runs into an entirely different problem. We heard a lot about that in the district court. And that's when Harmonic reports a drastic reduction in sales from AT&T. This reduction has nothing to do with Divicon. AT&T was the main customer of Harmonic before the merger on the side of the businesses. It has nothing to do with satellite. Now in the district court, plaintiffs complained that before the merger Harmonic was too dependent on AT&T. And on appeal they've dropped that allegation, but they're still in the complaint. So the merger allows Harmonic to diversify its customer base. And if anything, cushions the blow when Harmonic later loses sales to AT&T. So the allegations about dependence on AT&T, which are in the complaint, suggest that Harmonic's shareholders would have been worse off had they not diversified by merging with Divicon. Now plaintiffs try to find a duty to update in their briefs by relying on a lot of loose language, primarily from cases under 10B involving implied right of action, and all of them involving facts that aren't present here. If one reads the cases carefully, it becomes clear that they either involved a duty to disclose an affirmative misstatement, to correct an affirmative misstatement, or a specific prediction about future earnings. Harmonic made no specific prediction about future earnings for the first quarter. Shareholders knew that they didn't have first quarter information. Harmonic didn't say one way or the other. In fact, it did warn in the risk factors that Divicon's revenues were difficult to predict and could fluctuate at any particular quarter. You mentioned you wanted to have 10 minutes for your colleague. Thank you, Your Honor. I'll just wrap up. Significantly, there's no case from this Court imposing this duty to update post the effective date of the registration statement. And if it wanted to, Congress could impose a rule that says whenever you have a quarter in progress, when you're doing a transaction and it turns out to be bad, you should disclose that. Or the SEC could draft a regulation. But they've chosen not to. And on these allegations here, this Court should not create that rule. Thank you. Thank you, Ms. Garland. Good morning. May it please the Court, my name is Cheryl Fong. I represent the C-Cube defendants. Before turning to my argument, I'd like to answer Your Honor's question first. Why shouldn't we just allow further amendment here? There's a procedural barrier that the plaintiffs have failed to meet in this case. And that procedural barrier is this is a 59E case. They waited until after judgment. After judgment was entered, they only then asked the Court for leave to set aside the judgment under Rule 59E and then leave to amend the complaint. And significantly on this appeal, they do not allege that Judge Hamilton erred in denying Rule 59E leave to open up the judgment. So I don't think this Court even gets to the issue of amendment. And I can address that more fully later down the road if the Court has more questions on that. Now, let's go back to that because we've discussed it. Your position is that at the time of the motion to dismiss of the hearing was an opportunity to put forward what they would amend. They didn't take that opportunity, and they only moved under 59E. Correct. At that time, put forward their proposed amendment, which under your interpretation of 59E is too late. That's correct. They have to first make their showing to set aside the judgment. They've not shown on this record, and they don't even attempt to show how Judge Hamilton abused her discretion with regard to that determination. And only if they can make that determination do they then get to the issue of whether leave to amend was properly denied. I'd like to turn now to the two main claims asserted against my clients. And so I plan to address the claims that there was something deceptive about the timing of the April 24th press release and C-Cube's proxy statement to its own shareholders that this merger was in their best interest. I also plan to turn to the two recent reversals by the Ninth Circuit Court of Appeals and put those in the context of this case because those reversals are in stark contrast to anything that's been alleged in this case. Plaintiffs allege that C-Cube's scheme was in deliberately postponing the April 24th press release until after the shareholder vote because it knew it had bad Q1 results and was trying to hide them. This argument is completely without merit. And the reason it's without merit is because back on December 29th, before Q1 ever even started, my clients told its shareholders in an SE filing that in the event there was a shareholder vote approving this merger, it would proceed to account for Divicom under APB number 30. And those accounting rules have very specific rules on how to account for a sale of a segment of a business. It told investors that if there were shareholder approval, it would record Divicom as a discontinued operation, it would report operations separately as a component of income, and it would evaluate the effect of the sale of the division on the net income of C-Cube as a whole. After the vote on April 24th, C-Cube issued its press release. And the very purpose of the press release was to tell its shareholders, okay, we've had the vote and you've approved the merger and this is how we're going to account for Divicom. And it then proceeded to reflect the figures on the sale of the Divicom division precisely in accordance with APB number 30, precisely in accordance with what it told shareholders it would do back on December 29th. So there's nothing nefarious about the timing of the press release. The press release's issuance was completely logical and was completely in compliance with what C-Cube told its shareholders it was going to do back before the quarter even started. And so the accounting was not driving the vote here, but the vote was driving the accounting. And there's never been a claim here that the numbers in the April 24th press release were false or untrue in any way. And the plaintiffs have even admitted three separate times that C-Cube complied with all SEC reporting requirements. And they say that in their proposed new complaint, which is supposedly their best chance of ever stating a claim. And they say that in paragraph 65I, paragraph 66, and paragraph 51. C-Cube complied with its reporting requirements. The plaintiffs also argue in the reply brief that this was just a fait accompli. This was just because the shareholders didn't have the opportunity to look at this. But that's a misstatement of the record because the April 24th press release was released at a time before the merger when Harmonic's board had a right to evaluate that. And if Harmonic thought that C-Cube had deceived it or made any misrepresentations of fact in any way, it had a right to terminate the merger. Ms. Fong, when did C-Cube first report DIVICOM's first quarter earnings? It reported the income net of taxes on April 24th. And it reported the sales figure in its form Q, 10Q, on May 15th. So after the vote. Yes, it did. So getting back to my point, Harmonic's board had the right to terminate the merger if it thought that there had been any misrepresentations of fact. And plaintiffs never explain why Harmonic would have wanted this acquisition to go through if it believed that DIVICOM was a failing business or the reasons for the merger had changed. And significantly, plaintiffs said in his opening argument that this information was buried in the April 24th press release, but the market just missed it. Well, that's not a good argument on a fraud on the market case. And in fact, the fact that there wasn't a response in the market defeats their argument that somehow this information made a difference. So here's where we're on on these Q1 results. They concede that we complied with all of our reporting requirements. There was nothing false in the April 24th press release. The numbers were completely accurate, the same as what they were on May 15th. There's no issue on the timing of the press release vis-à-vis the shareholders who are voting. And so not only is there nothing false or misleading here, but where there's nothing false or misleading, you simply can't have a strong inference of Cyanar. And again, there can't be an intent to deceive shareholders when we announced the plan back in December before the quarter even opened. I'd like to turn now to the last main argument against my clients, which is the claim that CQB's board told its shareholders in the proxy statement that this merger was in their best interest. This claim fails for multiple reasons. First and foremost, the plaintiffs never alleged that the CQB board didn't in fact believe this merger was in the best interest. And I'm going to get to the stock sales in a minute, but I just want to state that the CQB defendants retained the vast bulk of their holdings. And so they were in there in solidarity with their CQB shareholders, and there's no suggestion by the retention of the vast quantity of their CQB stock that they somehow would have believed that this merger was not in the best interest of CQB. The theory in this case also doesn't make any sense. The theory is that weakening sales of Divicom for Q1 somehow made this merger not in the best interest of CQB. But I'd like to assume for the moment that as of March 23rd, the date of the proxy statement, the CQB board knew that it was having a bad quarter. Plaintiffs have never explained why if that were true, having Divicom merge into a bigger, better, more diversified company would have made that a bad deal for CQB shareholders. And courts have looked at this exact identical argument and have completely rejected it as a matter of law. The court in Kane did that. The court in McKesson did that. And significantly, despite all the rhetoric in plaintiff's reply brief, there's never been an allegation that the shareholders would have changed the vote. Thank you very much, Ms. Phan. Thank you. Mr. Isaacson, you get the last word here. Thank you, Your Honor. As for an allegation whether the disclosure would have changed the outcome, the Supreme Court precedents indicate that that's not the standard. It has to be material information that could have changed the outcome and that reasonable investors would have wanted to consider. Would reasonable investors have wanted to consider the information? You bet they would have. Is it conceivable that some investor would say, wait a minute, here we're talking about giving up half of our company to go over to another company and it's collapsing on the proposal of that. Maybe we ought to just hold on to it. Now, did they have hopes that the deal was going to work out? I tell you, hopes that the deal is going to work out is not a defense to concealing information. What about Ms. Phan's Rule 59e point? On the Rule 59e point in our brief, we basically are going on leave to amend, as the Danova Review standard, the fact that we filed the 59e motion which was denied should not prejudice us and raise the standard to abusive discretion. If it does, then you apply an abusive discretion standard, and under cases like Foman v. Davis, I think that the discretion was abused. With respect to the assertions that we allege in our complaint that they complied with accounting and reporting requirements, counsel cites paragraph 65 sub Roman numeral I of the proposed Third Amendment complaint. Let me read it to you. It says it's relating to disclosure obligations on insider trading. By selling C-Cube stock at a time when they were not technically required to reveal Divicom's results in the regular course of business, that would be 34 Act 10Qs, defendants employed a device, scheme, or artifice to defraud investors. Well, the regular course of business is not a stock offering or a shareholder meeting to approve an extraordinary transaction, so we have not alleged that they complied with the reporting obligations by no means. With respect to the point that was made regarding fraud on the market, the market price rose on April 24th, but it fell 20% when the full reporting was made on May 15th, and the market reaction was summarized in a document defendants put in, Harmonics Request for Judicial Notice Exhibit 7, a CIBC World Markets Report, on May 16th. They quote, Harmonic shares declined over 20% today due to comments from their 10Q filed last night. The document indicated that Divicom, their recent acquisition closed May 3rd, grew only 3% year over year in their first quarter of 2000, ending March 31, well below the company's 30% full year 2000 guidance, well below what they were telling the market. Thank you, Mr. Vice Chairman. Thank you, Your Honor. Counsel, thank you. The case just argued is submitted. We're going to take about a 10-minute recess. We'll be back in 10 minutes. Thank you.
judges: Alarcon, Silverman, Bea